UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ALAN HOROWITCH,

               Plaintiff,

-vs-                                       Case No.  6:06-cv-1703-Orl-19KRS

DIAMOND AIRCRAFT INDUSTRIES, INC.,

               Defendant.
_____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Background

This matter came before the Court for a bench trial on December 8 and 9, 2009.  The sole question before the Court is whether Defendant Diamond Aircraft Industries, Inc. violated the Arizona Consumer Fraud Act ("ACFA") by engaging in a scheme to sell a single engine jet aircraft known as a D-Jet to Plaintiff Alan Horowitch.  (Doc. No. 149 at 43, filed September 28, 2009.) Plaintiff maintains that Defendant's unlawful scheme to sell him a D-Jet consisted of one or more of the following components:

1)      placing false and misleading advertisements that the D-Jet was "affordable," "$850,000," and "well under $1 million dollars";

2)      concealing the fact that Defendant did not intend to honor the contract price of $850,000;

3)      colluding with its competitors in the marketplace regarding the price of the D-Jet;

4)      concealing until July 2006 that it intended to charge Plaintiff $1,380,000 plus escalation costs for the D-Jet;

5)      falsely stating to Plaintiff that his contract was not for a fixed sales price of $850,000, but was merely to reserve a position in the production run; and

6)      conducting an unlawful "bait-and-switch" by executing Plaintiff's contract containing a fixed sales price of $850,000 and then insisting that he enter into a new contract at a price of $1,380,000 if he wanted to purchase a D-Jet.

(*Id.* at 43-44.)  Plaintiff seeks actual and punitive damages.  (*Id.* at 15-16.)

At the close of Plaintiff's case, Defendant moved for a judgment pursuant to Federal Rule of Civil Procedure 52(c) on the issues of liability, actual damages, and punitive damages.  (Doc. No. 184, filed Dec. 8, 2009.)  The Court granted Defendant's Rule 52(c) motion on Plaintiff's request for punitive damages and reserved ruling on all other issues.  (Doc. No. 178 at 2, filed Dec. 8, 2009.)  At the close of the evidence, Plaintiff moved the Court to reconsider its Order denying punitive damages.  (Doc. No. 188, filed Dec. 9, 2009.)

After considering the evidence presented at trial and the submissions by the parties, and after making determinations on the credibility of the witnesses, the Court enters its Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure as follows.

## Findings of Fact

### I.  The Parties

Plaintiff Alan Horowitch ("Horowitch") is a resident of Yuma, Arizona.  An orthopedic surgeon by profession, Plaintiff is also an experienced pilot.  Since he began flying in 1982, Horowitch has become a certified pilot, obtained multi-engine and instrument ratings, and logged over 3,200 hours of flying time.  He is a member of several aviation organizations and subscribes to many aviation publications.  In addition, Horowitch has experience purchasing airplanes,

including single-engine planes in 1983 and 1993 and a twin-engine plane in 2003. Horowitch also leases space in an aircraft hangar that he owns.

Defendant Diamond Aircraft Industries, Inc. ("Diamond") is a Canadian corporation with its principal place of business in London, Ontario, Canada. It is a wholly-owned subsidiary of Diamond Technologies, a German corporation. Diamond's president is Peter Maurer, and its CEO is Christian Dries. Defendant's business is the design, manufacture, and sale of airplanes. Independent sales agents also sell Diamond's planes. Diamond has design responsibility for a two-seat aircraft known as the DA20, it reproduces under license a four-seat aircraft known as the DA40, it does final assembly of the DA42 Twinstar twin engine aircraft ("Twinstar"), and it has overall design and production responsibility for the D-Jet, an airplane classified as a "very light jet" ("VLJ").

## II. The D-Jet

Between 2000 and 2005, a number of airplane manufacturers, including Diamond, announced that they were embarking on projects to manufacture VLJs. Unlike other VLJ concepts on the market, Diamond's D-Jet was the first VLJ proposed to be designed primarily for personal, as opposed to business, use. As a personal aircraft, the D-Jet was projected to have lower performance specifications but would be more spacious and cost less than other VLJs. Because all other VLJs on the market were priced over one million dollars, setting a price for the D-Jet below one million dollars was a major point of emphasis for Diamond. Christian Dries set the original D-Jet price at $850,000 sometime in late 2002 or early 2003. The original price was determined by adding together rough estimates of the D-Jet's three major components: the airframe, the avionics system, and the power plant. Estimates of these individual components were determined by looking

to the prices of components that Diamond already manufactured for its other planes and the prices of components manufactured by suppliers for purchase by Diamond that would produce the desired performance specifications. At the time the $850,000 price was set, however, the specific brands and models of components to be used in the D-Jet had not been determined.

Diamond announced its plans to manufacture the D-Jet in a press release dated January 14, 2003, which listed a number of performance specifications and stated that the "[p]rojected price will be well under US $1 Million." (P. Ex. 8.) As of this date, only the conceptual design of the D-Jet had been undertaken. The conceptual design included a layout of the aircraft and approximations of the performance, size, and weight. The initial conceptual design was undertaken by Diamond Aircraft GesmbH, an Austrian design and manufacturing company.[1] Design and manufacturing responsibility for the D-Jet was transferred to Diamond in 2004. Although Diamond had never designed a jet aircraft prior to the D-Jet, Diamond hired a lead designer with experience designing jets and contracted with other engineers with jet designing experience.

Diamond significantly changed the D-Jet between 2003 and 2006. Diamond added new technology that made the plane safer to operate. In addition, a new air traffic control interface was installed because the original interface had become outdated. Adding these components increased the D-Jet's weight, which required the D-Jet to have, among other things, a larger engine. Adding these components also increased the D-Jet's manufacturing cost. Diamond first performed a detailed cost analysis for the D-Jet in late 2005 or early 2006.

---

[1] No witnesses had personal knowledge of whether a cost estimate for the D-Jet was conducted during the initial design stage.

In July 2006, a D-Jet prototype was unveiled at DiamondFest, an exposition held at Diamond's facilities in London, Ontario. The D-Jet design was changed a number of times after DiamondFest, and the design will likely continue to change in the future, including after the first D-Jets are commercially manufactured. At the date of the trial in this case, however, Diamond has not obtained certification for the D-Jet from the FAA or Transport Canada, and no D-Jets have been commercially manufactured or sold to customers.

### III. Plaintiff Horowitch and the D-Jet

Plaintiff Horowitch first learned of Defendant Diamond through publications in the 1990's and believed Diamond to have a good reputation. Plaintiff became interested in purchasing a Diamond Twinstar in late 2002. On January 13, 2003, Plaintiff signed an order form for the purchase of a Twinstar and submitted a $10,000 deposit. (P. Ex. 3.) After signing the Twinstar order form, Plaintiff learned about the D-Jet through the aviation media.[2]

Horowitch found an advertisement containing information about the D-Jet and a D-Jet "Aircraft and Accessories Price List and Order Form" ("D-Jet Order Form") on Diamond's website. The D-Jet information on Diamond's website included a picture of the D-Jet, performance specifications,[3] and a statement that the "projected price will be well under U.S. $1 Million." (P.

---

[2] Horowitch testified that he believed he first read about the D-Jet in the aviation media and that he later visited Diamond's website. There is no evidence that Plaintiff read or relied upon Diamond's January 14, 2003 press release prior to placing an order for a D-Jet.

[3] Such performance specifications included: 4,700 pounds maximum takeoff weight, the ability to carry five people up to 25,000 feet, a cabin altitude of 8,000 feet, a speed of 315 knots, operations from 2,000 foot runways, ability to reach cruising altitude in 8 minutes, a 26g safety cockpit, expected certification in the first quarter of 2006, ground roll of 2,372 feet, maximum range of 1,320 nautical miles, Vmo of 295 knots, stall speed of 63 knots, rate of climb of 2,600 feet per minute, fuel consumption of 276 pounds per hour, static thrust of 1,400 pounds, MTOW of 4,750 pounds, empty weight of 2,590 pounds, payload of 2,162 pounds, fuel payload of 1,280 pounds,
(continued...)

Ex. 10.)  Plaintiff contacted Jeff Owen, the head of sales at Diamond, and received confirmation

from Owen that Plaintiff's prior $10,000 deposit for a Twinstar could be applied to the $20,000

deposit for a D-Jet.   Plaintiff admitted that no one at Diamond contacted him to announce that

orders for the D-Jet were being taken or represented to him that the price of the D-Jet was fixed at

$850,000.  In addition, Plaintiff testified that he understood the distinction between a "projected

price" "of well under US $1 Million" and the term "set price," which did not appear on Diamond's

website or on the D-Jet Order Form.

A price of $850,000 appeared on the D-Jet Order Form as the "Manufacturers Sugg[ested]

List Price (2003 Dollars)."  (P. Ex. 4 at 2.)  Horowitch testified that he understood this term to mean

the price that Diamond wanted to receive for the D-Jet, but at the same time, Horowitch knew that

the D-Jet was still being developed and that its exact specifications could change.  The D-Jet Order

Form specified that the D-Jet was a "single engine jet aircraft" and included "IFR avionics,

including Auto pilot / HSI," a "Glass cockpit," and a "Premium Interior."  (*Id.*)  Horowitch knew

the technical definitions of these components, but also he knew that the D-Jet Order Form did not

specify which brand or model of these components would be included in the D-Jet.   The D-Jet

Order Form further stated that "Additional Options," "Exterior Striping," and "Interior Options"

were to be determined, and Horowitch understood that adding additional options would increase the

cost of the D-Jet.  (*Id.*)  Despite his understanding, Horowitch wrote "$850,000" in the blank

[3] (...continued)
wingspan of 39.4 feet, exterior length of 35.5 feet, exterior height of 10.2 feet, cabin length inboard
of 11.6 feet, maximum cabin width of 4.8 feet, and cabin height inboard of 4.8 feet.  (P. Ex. 10 at
2.)  Horowitch testified that theses performance specifications were ones that a pilot would want to
know before purchasing an aircraft.  Horowitch further acknowledged that Diamond's website
stipulated that the listed specifications were subject to change.  (*Id.*)

adjacent to the price listed on the D-Jet Order Form.  (*Id.*)  Horowitch also wrote "one" adjacent to the blank for "North American Delivery Position." (*Id.*)

Plaintiff pointed out that the D-Jet Order Form, unlike many other new airplane purchase contracts he had seen, did not contain a price escalation clause to account for the uncertainty regarding when the plane would be delivered.  However, the D-Jet Order Form stated that "[p]rice and specifications [were] subject to change without notice."  (*Id.*)  Despite this clause which appeared on the front of the form, Horowitch maintained that he wrote in $850,000 on the D-Jet Order Form because that was the maximum price he was willing to pay and that $850,000 became the firm price for the D-Jet when Diamond accepted his order.

Horowitch was not the only customer who wrote in $850,000 on the D-Jet Order Form.  (P. Ex. 34.)  There was some confusion among customers in 2003 about whether the D-Jet price was fixed at $850,000 or subject to change.  When customers asked Diamond about a fixed price, Diamond responded that there was no fixed price.  Horowitch, however, did not question Diamond about a fixed price before he signed the D-Jet Order Form.  Diamond removed "$850,000" from the D-Jet Order Form in late 2003 to clarify that the base price of the D-Jet was subject to change. Diamond did not attach any significance to the fact that some customers wrote in $850,000 on their order forms because Diamond believed that the price was "subject to change without notice" pursuant to the provision that appeared on the face of the D-Jet Order Form.

On March 17, 2003, Horowitch submitted an executed D-Jet Order Form, an additional $10,000 deposit, and a letter to Diamond.  (P. Ex. 16.)  Plaintiff acknowledged in the letter that Diamond was "early on in the design and marketing of the D-Jet so exact specifications are still pending."  (*Id.*)  Horowitch further stated in this letter that he "assumed" the purchase price of

$850,000 would include ice certification, air conditioning, and a factory sponsored and reimbursed type rating course. (*Id.*) Importantly, Horowitch insisted in his letter to Diamond upon "a guarantee of price reduction to the lowest announced price if, at any time until my delivery date, a lower price is announced." (*Id.*)

Diamond accepted Plaintiff's order by letter on June 14, 2004. (P. Ex. 15 at 1.) Diamond countersigned Horowitch's D-Jet Order Form and assigned to him the fourth North American delivery position, not the first position as Horowitch had written on the form. (*Id.* at 2.) Diamond did not change the $850,000 price that Horowitch had written on the form. (*Id.*) Between September 2004 and July 2006, Horowitch and Diamond exchanged emails and telephone calls concerning the design progress of the D-Jet. Horowitch asked specific questions about the D-Jet's performance specifications, including the accelerate/stop distance at high-altitude airports and why the fuel payload was decreased from 880 to 505 pounds. (P. Exs. 42, 122.) No evidence was presented that price was discussed during this time period.

On January 14, 2005, Diamond sent a bulletin to its regional distribution centers stating that the prices of the Twinstar and D-Jet were currently undergoing review and that new prices would be released by the middle of February 2005. (P. Ex. 6.) Diamond did not send this bulletin to Horowitch, other customers who ordered D-Jets, or the general public.

Horowitch read in the aviation press in July 2006 that Diamond was offering the D-Jet for sale at a price of $1,380,000. Horowitch testified that he did not believe that such price applied to him because Diamond had not contacted him at that time about increasing the price from $850,000 to $1,380,000. Diamond invited the customers who had ordered a D-Jet, including Horowitch, to the DiamondFest exposition, but Horowitch did not attend. Diamond announced at DiamondFest

that the new price of the D-Jet would be $1,380,000 for all customers, and Diamond instructed its current customers to choose between signing a new D-Jet sales contract at the $1,380,000 price or receiving a return of their deposits and forfeiting their order positions. The new D-Jet sales contract included, among other terms, a sales price of $1,380,000, an escalator clause for inflation, a 5% escalator applied at Diamond's sole discretion, and a venue provision that all disputes would be resolved in Canada.

On August 31, 2006, Diamond sent Horowitch a letter offering him the same two options that were given to other D-Jet customers at DiamondFest. (P. Ex. 30.) Plaintiff refused both options and insisted that his D-Jet Order Form set a fixed price of $850,000. Horowitch testified at trial that if he had known that Diamond did not intent to honor the $850,000 price, he would have bought another type of plane.

## IV. Industry Practice and Custom

Expert testimony revealed that it is customary in the airplane manufacturing industry to take orders for planes that are merely in the concept or preproduction stage of development. If many orders for a plane are received, a bandwagon effect is created which generates more orders and positive press for the design. A deposit is generally required to place an order, and often the depositor is assigned a reserved position number. The lower the reserved position number, the sooner the customer will receive a plane once manufacturing commences. Design periods of six years or more prior to manufacturing are typical, particularly when dealing with new technology like the VLJ concept.

Orders for new planes are generally taken with the understanding that the contemplated design may change, the cost may change, and in some cases, the actual plane may never be built for

lack of a commercially viable design. It is well-known among most buyers and sellers of new concept airplanes that there is an inevitability of change in a plane's equipment, performance, size, and cost during the design process. Such is especially true with an emerging airplane technology like the VLJ concept. For example, plane components may change due to advancements in safety and performance, and the mechanics of flight make plane components dependent upon each other so that changing one component may require that other components be changed. In the case of the D-Jet, added safety features increased the weight of the plane, which increased the thrust required to keep the plane airborne, and which therefore required a more powerful and expensive engine to be installed. As the individual components of the plane change, so too does the cost of the plane. The cost variable is magnified by the fact that plane manufacturers like Diamond rely upon component suppliers whose costs may similarly change. Unforeseen certification costs also may affect the final cost of the plane, and the plane design may change even after a company obtains certification and first manufactures a plane.

New plane manufacturers typically account for pricing uncertainties by inserting one of two clauses into their purchase contracts. Purchase contracts either contain an escalation clause, which adjusts the price to reflect inflation and the time value of money, or they contain a statement that the price is subject to change without notice. The D-Jet Order Form at issue here specifically stated that both price and specifications were subject to change without notice. (P. Ex. 4 at 2.) Manufacturers generally announce the final price of a plane four to six months prior to its manufacture.

Diamond obtained over 200 orders for the D-Jet, and other leading VLJ manufacturers obtained a similar number of orders. Although the VLJ concept was initially well-received, VLJ manufacturers have generally encountered design, manufacturing, and financial problems. As of

May 2007, only two manufacturers, Cessna and Eclipse, have delivered VLJs to customers. Eclipse, a start-up company which exclusively produced VLJs, recently filed for bankruptcy. As noted earlier, at the date of the trial in the instant case, Diamond has not obtained certification for the D-Jet and has not delivered any D-Jets to its customers.

## Conclusions of Law

### I. Jurisdiction and Venue

Subject matter jurisdiction must be affirmatively shown in the record before considering the merits of any case. *E.g.*, *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1247 (11th Cir. 2005). This case was initially brought in the Circuit Court of the Ninth Judicial District, in and for Orange County, Florida, and was timely removed to this Court by Diamond. (Doc. No. 1 at 1, filed Nov. 2, 2006.) Removal jurisdiction is proper here because the requirements for diversity jurisdiction are satisfied,[4] and Diamond is not a citizen of the State of Florida. *See* 28 U.S.C. § 1441(b) (2009) ("Any [action satisfying the requirements of diversity jurisdiction] shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.").

No party has objected to venue in the Middle District of Florida, but for completeness, the Court determines that venue is proper here. Pursuant to the D-Jet Order Form, the parties agreed that the "State of Florida shall have exclusive . . . venue to settle any . . . disputes or controversies"

---

[4]  Plaintiff Horowitch is a resident of the State of Arizona. Defendant Diamond is incorporated under the laws of Canada and has its principal place of business in London, Ontario, Canada. There is no evidence that Diamond Aircraft is incorporated in or maintains a principal place of business in Arizona. In addition, Plaintiff seeks damages exceeding $75,000. Because the parties are completely diverse and the amount in controversy exceeds $75,000, the elements of diversity jurisdiction are satisfied. 28 U.S.C. § 1332 (2009).

arising out of the D-Jet Order Form. (P. Ex. 4 at 3.) The parties did not waive their rights to transfer

or remove this case, so it could be removed to federal court as permitted by statute. *Cf. Ocwen*

*Orlando Holdings Corp. v. Harvard Prop. Trust, LLC*, 526 F.3d 1379, 1381 (11th Cir. 2008)

(prohibiting removal to federal court where the parties waived "any right to transfer"). The general

removal statute, Section 1441 of Title 28, provides that the venue of a removed case is "the district

and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). For purposes

of removal, the Orlando Division of the Middle District of Florida embraces the Ninth Judicial

District, in and for Orange County, Florida. Local Rule 1.02(b)(3). Accordingly, venue is proper

here.

## II. Arizona Consumer Fraud Act

The Arizona Consumer Fraud Act provides:

> The act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

A.R.S. § 44-1522 (2009). Arizona courts recognize a private right of action for a violation of this

statute. *Sellinger v. Freeway Mobile Home Sales, Inc.*, 521 P.2d 1119, 1122 (Ariz. 1974). The

statute prohibits (1) "any deception, deceptive act or practice, fraud, false pretense, false promise,

misrepresentation" and (2) "concealment, suppression or omission of any material fact." A.R.S. §

44-1522. These two theories of liability, deception and concealment, are comprised of different

elements. The elements of a claim of deception are (1) a false promise or misrepresentation made

in connection with the sale or advertisement of merchandise; (2) intent to perform the act

constituting a false promise or misrepresentation; (3) actual reliance by the plaintiff on the false

promise or misrepresentation, even if unreasonable; and (4) consequent and proximate injury resulting from the false promise or misrepresentation. *Kuehn v. Stanley*, 91 P.3d 346, 351 (Ariz. Ct. App. 2004); *State ex rel. Babbitt v. Goodyear Tire & Rubber Co.*, 626 P.2d 1115, 1118 (Ariz. Ct. App. 1981); *Parks v. Macro-Dynamics, Inc.*, 591 P.2d 1005, 1008 (Ariz. Ct. App. 1979). The Court previously held that a "bait-and-switch" scheme is a deceptive act under the ACFA. (Doc. No. 168 at 13-14.)

A claim of concealment requires (1) the concealment, suppression, or omission of a material fact made in connection with the sale or advertisement of merchandise; (2) intent to perform the act constituting concealment, suppression, or omission; (3) intent that others rely upon such concealment, suppression or omission; (4) actual reliance by the plaintiff on the concealment or omission, even if unreasonable; and (5) consequent and proximate injury resulting from the concealment, suppression, or omission. *Sellinger*, 521 P.2d at 1122; *Kuehn*, 91 P.3d at 351; *State ex rel. Babbitt*, 626 P.2d at 1118 n.1; *Parks*, 591 P.2d at 1008.

Plaintiff alleges that certain actions by Diamond constituted deception and concealment in violation of the ACFA. The Court will separately address each alleged unlawful act.

## III. Alleged Acts of Deception and Concealment by Diamond

### A. False and Misleading Advertisements that the D-Jet was "affordable," "$850,000," and "well under $1 million dollars"

The D-Jet advertisement viewed by Plaintiff on Diamond's website in early 2003 stated that the D-Jet was "affordable"[5] and that its "projected price will be well under U.S. $1 Million." (P. Ex.

---

[5] The term "affordable" used in the website advertisement is relative and a matter of opinion and thus could not deceive or be relied upon as a matter of law. *Law v. Sidney*, 53 P.2d 64, 66 (Ariz.
(continued...)

10.)  The D-Jet Order Form listed $850,000 as the "Manufacturers Sugg[ested] List Price (2003 Dollars)" and stated that price was "subject to change without notice."  (P. Ex. 4 at 2.)  By maintaining that these price advertisements were false and misleading, Plaintiff is claiming that the advertisements constituted a deceptive practice in violation the ACFA.  *See* A.R.S. § 44-1522 (prohibiting "any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation").  The ACFA directs courts to look to the FTC Act and decisions interpreting the FTC Act for guidance in defining unlawful deception under the ACFA.  A.R.S. § 44-1522(a),(c).

### 1. Deceptive D-Jet Advertisements

Plaintiff must first prove that the D-Jet price advertisements were in fact deceptive.  The Code of Federal Regulations interpreting the FTC Act states that manufacturers must have a good faith basis for advertised prices:

> It bears repeating that the manufacturer, distributor or retailer must in every case act honestly and in good faith in advertising a list price, and not with the intention of establishing a basis, or creating an instrumentality, for a deceptive comparison in any local or other trade area.

16 C.F.R. § 233.3 (2009).

Diamond had a good faith basis for projecting the D-Jet price well under $1,000,000 and listing a price of $850,000 subject to change without notice on the D-Jet Order Form.  The initial D-Jet concept included a number of performance specifications, and Diamond reasonably estimated the costs of the components that would theoretically achieve those specifications.  Moreover, it would have been unreasonable for Diamond to have conducted a detailed cost or pricing analysis in early 2003 because the VLJ concept was unproven technology, because the D-Jet was merely in

_____

[5] (...continued)
1936).

the conceptual design stage, and because the D-Jet components and specifications would inevitably change before the D-Jet would be manufactured years later.

Further, Diamond in good faith stated that the D-Jet price was subject to change without notice because a change-without-notice clause reflects the custom and practice in the airplane manufacturing industry that while orders are taken for a plane of new design, the plane's design and production costs inevitably change due to technological advancements in performance and safety, among other things. As the design and production costs change, airplane manufacturers typically change their announced sales prices in order to remain both commercially viable and competitive in the marketplace. In the case of the D-Jet, the design and price were particularly subject to change because VLJs had never been commercially manufactured. In light of the industry custom and practice to revise a new plane's design and sales price, particularly for a new type of plane based upon new technology, Diamond set the D-Jet price subject to change without notice in good faith.

Diamond was also motivated to project a price under $1,000,000 and to set a price of $850,000 "subject to change without notice" so that Diamond would be the first manufacturer to offer a VLJ for under $1,000,000. The D-Jet price advertisements, however, did not create a deceptive comparison to the other more expensive VLJs on the market. Unlike other VLJs, the D-Jet was targeted for personal, as opposed to business, use. The D-Jet's large cabin, modest performance specifications, and low fuel consumption distinguished it from industry counterparts. Diamond anticipated that the D-Jet's modest performance specifications could be obtained with moderately priced components, thereby allowing Diamond to project in good faith a lower price for the D-Jet than other VLJs on the market. Thus, the D-Jet price advertisements did not facilitate deceptive comparison to other VLJs.

In summary, the Court concludes that Diamond projected a price "well under" $1,000,000 and set a price of $850,000 "subject to change without notice" in good faith because those figures were supported by commercially reasonable estimates and because there was no evidence presented that at the time the suggested price was set that, despite the inevitability of change and uncertainty in plane design, such a price could not be realized. Therefore, Diamond's price advertisements were not deceptive.

### 2. Actual Reliance by Plaintiff

Diamond's price advertisements also did not violate the ACFA because Horowitch did not actually rely on the price advertisements when ordering a D-Jet. Knowledge of the true facts or circumstances precludes actual reliance on any false or misleading representation. *See Peery v. Hansen*, 585 P.2d 574, 577-78 (Az. Ct. App. 1978) (holding that there can be no reliance and thus no recovery under the ACFA where the plaintiffs actually knew that the defendant's statements were false). Plaintiff could not have relied on a "projected price" of "well under U.S. $1 Million" because the term "projected price," by its plain meaning and Plaintiff's admission at trial, gave no indication as to actual sales price. Despite Plaintiff's testimony to the contrary at trial, his understanding of the plain meaning of the phrase "subject to change without notice" similarly precluded his reliance upon the price of $850,000 stated in the D-Jet Order Form.

Horowitch contends that the term "price and specifications subject to change without notice" was nullified by Diamond's acceptance of Plaintiff's Order, but there is no basis in the facts or law to support this assertion. Plaintiff's argument presumes that a binding contract was formed by Horowitch's executed D-Jet Order Form and Diamond's countersigned D-Jet Order Form, and that the parties intended such contract to exclude the provision on the face of the D-Jet Order Form that

"price and specifications [are] subject to change without notice." (P. Ex. 4 at 2); *see State v. Family Bank of Hallandale*, 623 So. 2d 474, 479 (Fla. 1993) ("In order to form a binding contract there must be a common or mutual intention of the parties. Mutual assent is an absolute condition precedent to the formation of a contract.").[6] However, the evidence received by the Court shows that Horowitch and Diamond mutually assented to all provisions on the face of the D-Jet Order Form, including the change-without-notice provision. The change-without-notice provision was not crossed out by either party on the D-Jet Order Form (P. Exs. 4, 16), thereby indicating that both parties intended the change-without-notice provision to be binding like all other provisions on the form. *See, e.g.*, *Goldbloom v. J. I. Kislak Mortg. Corp.*, 408 So. 2d 748, 749-50 (Fla. 3d DCA 1982) (finding an issue of fact as to what the parties actually intended by crossing out a provision in a contract). Plaintiff's mutual assent to the change-without-notice provision is further evidenced by the March 17, 2003 letter that he submitted to Diamond along with his D-Jet Order Form. By his own admission in the March 17, 2003 letter, Horowitch "realize[d] that you at Diamond [were] early on in the design and marketing of the D-Jet," that the D-Jet specifications and components were subject to change during development, and that changing the D-Jet's design might prompt a change in price. (P. Ex. 16.) In addition, Horowitch's insistence in the March 17, 2003 letter that he receive the benefit of a price reduction on the D-Jet under certain circumstances makes clear that Plaintiff did not rely on the $850,000 figure as a firm price. (*Id.*) Thus, the parties mutually assented to the change-without-notice provision, and the Court rejects Plaintiff's argument that the change-without-notice provision was nullified by Diamond's acceptance of Plaintiff's order.

---

[6] Pursuant to the D-Jet Order Form, "[a]ny disputes or controversies between the parties . . . shall be governed by and construed in connection with the laws of the State of Florida." (P. Ex. 4 at 3.)

Horowitch's asserted reliance on the D-Jet price advertisements stands in contrast to the understanding of a well-read and sophisticated pilot and purchaser of airplanes, which Horowitch is. In light of Horowitch's knowledge of aviation technology and his many years experience as a pilot and purchaser of airplanes, he must have known the uncertainty associated with pricing the D-Jet during the initial design phase, particularly where the D-Jet was based on emerging VLJ technology and had never been commercially manufactured by any company. As discussed previously, clauses stating that price is subject to change without notice are common on order forms for new airplanes, and in light of Plaintiff's experience purchasing aircraft, Plaintiff must have understood the non-binding nature of the price listed on the D-Jet Order Form. In addition, Plaintiff, unlike some other customers, never asked Diamond for clarification as to whether it considered the D-Jet Order Form to set a binding price. Rather, over the three years between submitting his D-Jet Order Form and Diamond increasing the D-Jet price to $1,380,000, Horowitch communicated several times with Diamond about a number of changes to the D-Jet specifications and components, but he never inquired about changes in price. (P. Exs. 39-43, 120-22.)

If, as Horowitch contends, he believed $850,000 to be a firm price, then Horowitch could not have known what $850,000 would have bought him. At the time he signed the contract, Horowitch knew that the D-Jet was in the early stages of development and that no company, including Diamond, had ever commercially manufactured a VLJ. The D-Jet Order Form specified some, but not all of the necessary components of an airplane, and for the components listed, there was no indication as to the brand or model of those components. Further, Horowitch "assumed" in the March 17, 2003 letter that he submitted to Diamond with his D-Jet Order Form that the D-Jet would contain additional components that were not specified on the Order Form. (P. Ex. 16.) The

lack of specificity on the D-Jet Order Form, Plaintiff's knowledge that VLJs had never been commercially manufactured, and Plaintiff's familiarity with airplane equipment further support the conclusion that Plaintiff did not actually rely on $850,000 as a firm price.

In light of Horowitch's actions, his technical knowledge of airplanes, his experience purchasing airplanes, and his knowledge of industry custom, it must be concluded that Horowitch understood Diamond to have merely projected a price well under $1,000,000 and that the $850,000 price in the D-Jet Order Form was, as the form plainly stated, subject to change without notice. (P. Ex. 4 at 2.) Because Horowitch knew that Diamond's advertisements did not set a fixed sales price for the D-Jet, he could not have actually relied on the D-Jet advertisements to set a fixed price. *Peery*, 585 P.2d at 577-78. The absence of actual reliance by Plaintiff on the D-Jet price advertisements for a firm price is, by itself, a sufficient ground for rejecting Plaintiff's claim that such advertisements violated the ACFA.

### B. Concealing the Fact that Diamond Did Not Intend to Honor the $850,000 Price

Horowitch next argues that Diamond concealed its plan not to honor the $850,000 price stated in the D-Jet Order Form. "Concealment is an affirmative act intended or known to be likely to keep another from learning of a fact of which he would otherwise have learned." Black's Law Dictionary 327 (9th ed. 2009) (quoting Restatement 2d Contracts § 160 cmt. A (1979)). Concealment also exists where the seller states a "half-truth," for example, by making an affirmative claim without disclosing qualifying information necessary to avoid giving a misleading impression. *In re Int'l Harverster Co.*, 104 F.T.C. 949, 1058 (1984). The fact allegedly concealed from Plaintiff here is that Diamond did not intend to honor the $850,000 price.

Horowitch's concealment claim here must fail because there was no evidence that Diamond actually concealed its intent not to honor the $850,000 price. The D-Jet Order Form clearly stated that the listed price of $850,000 was subject to change without notice, and Horowitch knew that the $850,000 price on the D-Jet Order Form was subject to change without notice. *See supra* part III.A.2. Because the D-Jet Order Form informed Horowitch that Diamond might change the D-Jet price without notice and because Diamond made no direct or indirect representations to Horowitch that the $850,000 price would remain fixed, Diamond did not conceal its intent not to honor the projected price of $850,000 from Horowitch. Accordingly, Plaintiff's claim of concealment must be rejected.

### C. Diamond's Collusion with Market Competitors to Set the D-Jet Price

Horowitch claims that Diamond colluded with market competitors to set the D-Jet price at $1,380,000. In support of this claim, Horowitch introduced evidence that Christopher Finoff, a buyer and seller of used aircraft who formerly owned a Beech franchise and worked for several other airplane manufacturers, traveled to Diamond's factory in London, Ontario in 2006, viewed the D-Jet prototype, and met with Peter Maurer to discuss D-Jet pricing.

Horowitch does not cite, and the Court does not find, any caselaw supporting Plaintiff's argument that the alleged anti-competitive conduct by Diamond violated the ACFA. The ACFA recognizes a private right of action for claims of deception or concealment, not unfair trade practices or unfair methods of competition. *In re New Motor Vehicles Canadian Export Antitrust Litigation*, 350 F. Supp. 2d 160, 178 (D. Me. 2004). The Court also finds no evidence in the record to show that Christopher Finoff's discussion of D-Jet pricing with Peter Maurer constituted unlawful deception or concealment.

Horowitch further asserts that Diamond raised the price of the D-Jet to $1,380,000 merely because the D-Jet was the lowest priced VLJ on the market, and thus D-Jet customers had no choice but to accept the increased price. Horowitch does not cite, and the Court does not find, any legal authority for the proposition that such conduct violated the ACFA. Contrary to Horowitch's argument, the evidence shows that Diamond lawfully set the D-Jet price at $1,380,000. The detailed cost estimate performed in good faith by Diamond in late 2005 or early 2006 served as a factual basis for the $1,380,000 price.[7] *See supra* part III.A.1. Further, increasing the D-Jet price during the design phase comports with the airplane manufacturing industry custom to amend the sales price of a new plane as design changes are made. Absent any facts or law supporting Horowitch's claim of collusion, it must be concluded that Diamond did not unlawfully collude with market competitors in setting the D-Jet price in violation of the ACFA.

**D. Concealing Until July 2006 that Diamond Intended to Charge Plaintiff $1,380,000 Plus Escalation Costs for the D-Jet**

Horowitch contends that Diamond's delay in notifying him of the $1,380,000 price constituted concealment of a material fact in connection with the sale of the D-Jet in violation of the ACFA. Such concealment allegedly arose from (1) Diamond's failure to conduct a detailed cost estimate prior to late 2005 or early 2006; and (2) Diamond's failure to communicate that price estimate to Horowitch prior to August 31, 2006. Because there is no evidence that these alleged actions constituted concealment or that Horowitch relied on the alleged concealment, Plaintiff's claim must be rejected.

---

[7] Since the D-Jet is still in the design stage and has not been certified or placed in the market for sale, its price may increase further.

### 1. Failure to Conduct a Detailed Cost Estimate Prior to Late 2005

Because concealment "is an affirmative act intended or known to be likely to keep another from learning of a fact of which he would otherwise have learned," Black's Law Dictionary 327 (9th ed. 2009), Diamond could not have concealed the price of $1,380,000 until the time when such price was known or should have been known to it. There is no evidence in the record that Diamond conducted a detailed cost estimate for the D-Jet prior to late 2005 or that Diamond could have reasonably conducted a detailed cost estimate any sooner. Moreover, it is customary in the aircraft manufacturing industry to declare an initial design concept for a plane, to amend that design over the course of the evolution of the design, sometimes six or more years, and to adjust the price of the plane to reflect the design changes. A lengthy design period containing substantial design changes is particularly common when designing an aircraft based on new technology such as the D-Jet. The D-Jet price of $1,380,000 was based upon an estimate made in early 2006 at the latest, merely three years after the D-Jet concept was originally announced. In light of the industry custom to amend the design of a new plane over an extended period of time and the absence of evidence that Diamond could have made a detailed cost estimate prior to late 2005 or early 2006, Diamond did not conceal the $1,380,000 price of the D-Jet by failing to conduct a detailed cost estimate prior to that time.

### 2. Failure to Inform Plaintiff of the D-Jet Price Change Until August 31, 2006

As with the previous claim of concealment, there is no evidence that Diamond concealed the $1,380,000 price between the time it conducted the price estimate in late 2005 or early 2006 and its letter to Horowitch dated August 31, 2006. Diamond invited Plaintiff to the July 2006 DiamondFest exposition and announced the $1,380,000 price at DiamondFest, but Horowitch did not attend. Horowitch read about the $1,380,000 price in the aviation media in July 2006 and testified that he

did not believe that such price applied to him. Horowitch offered no evidence that the delay between late 2005 and August 31, 2006 was so long as to constitute concealment of a fact which Horowitch should have known sooner. In the absence of sufficient evidence, Horowitch's claim that Diamond unlawfully concealed the increased D-Jet price must be rejected.

### 3. Reliance

Assuming, arguendo, that Diamond's failure to conduct a detailed cost estimate prior to late 2005 or Diamond's failure to inform Horowitch of the price change until August 31, 2006 constituted unlawful concealment, Plaintiff's claims must still be rejected because he failed to prove any actual reliance on the acts of concealment. Horowitch maintained that he would have purchased another airplane had he known about the D-Jet price change, but he offered no evidence as to which plane he would have purchased or when, if ever, such plane would have been available for delivery. The absence of proof of reliance is an independent and sufficient ground for rejecting Horowitch's claim that Diamond unlawfully concealed the $1,380,000 purchase price. In any event, Horowitch's arguments in this regard are without merit because the D-Jet Order Form advised him that the D-Jet price was subject to change without notice, and Plaintiff understood the plain meaning of that term of the contract. *See supra* part III.A.2.

### E. Falsely Stating to Plaintiff that His Contract Was Not for a Fixed Sales Price of $850,000, But Was Merely to Reserve a Position in the Production Run

After Diamond presented Horowitch with a new contract for a D-Jet at the $1,380,000 price, Diamond told Horowitch that the D-Jet Order Form was not a contract for a fixed price but was merely to reserve a position in the production run. Plaintiff's claim that this statement by Diamond

was false, and therefore deceptive, is contradicted by the plain language of the D-Jet Order Form, industry custom, and Plaintiff's understanding of both.

The D-Jet Order Form clearly stated that the $850,000 price was subject to change without notice, and Horowitch knew that the $850,000 price on the D-Jet Order Form was subject to change without notice. *See supra* part III.A.2. Thus, Diamond's statement about the D-Jet Order Form was neither false nor deceptive, and Horowitch could not have relied upon such statement because he knew that Diamond's interpretation of the D-Jet Order Form was consistent with the plain language on the Order Form. *Peery*, 585 P.2d at 577-78. Finding no deceptive statement, or in the alternative, no reliance upon that statement, Diamond's statement that the D-Jet Order Form merely reserved a position in the production run did not violate the ACFA.

**F. Conducting an Unlawful "Bait-and-Switch" by Executing Plaintiff's Contract Containing a Fixed Sales Price of $850,000 and Then Insisting that Plaintiff Enter Into a New Contract at a Price of $1,380,000 If He Wanted to Purchase a D-Jet**

Plaintiff's final claim is that Diamond conducted an unlawful "bait-and-switch" by executing a D-Jet purchase contract for a fixed sales price of $850,000 and then requiring him to enter into a new contract at a price of $1,380,000 or lose his position in the production run. Because the Court previously held that a "bait-and-switch" was unlawful deception under the ACFA, (Doc. No. 168 at 13-14), the issue becomes whether Diamond's conduct was in fact a "bait-and-switch."

The Code of Federal Regulations interpreting the FTC Act defines "bait advertising," which includes any form of public notice however disseminated or utilized, as follows:

> Bait advertising is an *alluring but insincere offer* to sell a product or service which *the advertiser in truth does not intend or want to sell*. Its purpose is to switch consumers from buying the advertised merchandise, in order to sell something else, usually at a higher price or on a basis more advantageous to the advertiser. The

primary aim of a bait advertisement is to obtain leads as to persons interested in buying merchandise of the type so advertised.

16 C.F.R. § 238.0 (2009) (emphasis added). The $850,000 price listed on the D-Jet Order Form was alluring because the D-Jet was the first VLJ to be advertised under $1,000,000. In addition, the D-Jet Order Form served to obtain leads as to persons interested in purchasing a VLJ, and it is customary in the industry for airplane manufacturers to use order forms to obtains leads and a customer list. However, the $850,000 price was not bait advertising because it was sincerely set by Diamond in good faith and because there was no evidence that Diamond did not want to sell the D-Jet for that price.

Diamond's preliminary price estimate was sincere because it was based on the price of components that it anticipated in good faith would be produced by Diamond or purchased from others and used to manufacture a D-Jet with the advertised performance specifications. Moreover, there was no evidence that Diamond knew that the VLJ concept or the D-Jet performance specifications were not commercially viable or physically feasible. Diamond's $850,000 price was also sincere because it was subject to change without notice. The commercial and engineering realities of designing and manufacturing new airplanes based on experimental technology required Diamond to change the D-Jet design and components between 2004 and 2006, which ultimately necessitated a change in price.

Horowitch emphasized at trial that the D-Jet price increased over 62% from $850,000 to $1,380,000. No evidence suggested that this price differential was abnormal in the aircraft manufacturing industry for newly designed planes or that Plaintiff was unaware of the potential for design changes leading to such a price increase. As stated above, designing and manufacturing new aircraft based on emerging technology is an uncertain business. The evidence in this case

demonstrated that when a plane concept is first announced, customers and manufacturers cannot precisely predict the specific design, components, or price of the aircraft to be ultimately offered for sale, if an aircraft is offered for sale at all. Further, there was no evidence that the changes in design, components, and price of the D-Jet placed Plaintiff in a worse position or with an inferior product. To the contrary, as the design, components, and price changed, so too did the D-Jet performance specifications. Horowitch knew that such changes were probable in the design of new airplanes based upon emerging technology, he insisted upon receiving a price reduction if the D-Jet was offered for a lower price in the future, and he made numerous inquiries about the components being selected for the D-Jet. Therefore, it could not have been any surprise to Horowitch that as the D-Jet design and components were changed to enhance the D-Jet safety and performance, the D-Jet price was increased as a result.

Because Horowitch understood that the incomplete description of a D-Jet on the D-Jet Order Form was not necessarily the D-Jet that would be offered for sale and because Diamond's offer to sell at D-Jet for $850,000 subject to change without notice was sincere and in good faith, the D-Jet Order Form did not constitute bait advertising. Further, there was no evidence that the increased D-Jet price presented Diamond a more advantageous sale than the previously contemplated D-Jet offered at $850,000. Accordingly, the Court rejects Plaintiff's claim that Diamond conducted an unlawful "bait-and-switch" scheme.[8]

---

[8] Even if Diamond's conduct was bait advertising, Plaintiff's claim must still be rejected because he did not actually rely on Diamond's advertisements. *See supra* part III.A.2.

## IV. Damages

Finding no acts by Diamond in violation of the ACFA, Plaintiff is awarded no actual damages. In the absence of actual damages, no punitive damages may be awarded. *See Edmond v. Fairfield Sunrise Village, Inc.*, 644 P.2d 296, 298 (Ariz. Ct. App. 1982) ("A lawsuit for punitive damages only may not proceed once the cause of action for actual damages has been extinguished, actual damages being necessary to support punitive damages."); *Barker v. James*, 486 P.2d 195, 199-200 (Ariz. Ct. App. 1971) (holding punitive damages cannot be recovered where a plaintiff has no actual damages).

At trial the Court granted Diamond's Motion for judgment on Plaintiff's request for punitive damages, because there was no evidence that Diamond's conduct was wanton, reckless, or spiteful, or embodied a reckless indifference to the interests of Plaintiff or others. *Cearley v. Wieser*, 727 P.2d 346, 348-49 (Ariz. Ct. App. 1986). Rather, from the evidence the totality of Diamond's conduct in advertising, designing, and procuring Plaintiff's order to purchase a D-Jet was in good faith and comported with the custom and practice in the airplane manufacturing industry concerning the advertising, design, and sale of new airplanes on the forefront of aviation technology.

At the close of the evidence, Plaintiff moved the Court to reconsider its ruling on his request for punitive damages. (Doc. No. 188.) Upon reconsideration, the Court finds no law or facts contrary to the reasoning stated above. Accordingly, Plaintiff's request for punitive damages should be denied.[9]

---

[9] As of the date of the trial in this case, Diamond still possessed Horowitch's $20,000 D-Jet deposit. Horowitch did not request as relief the return of his deposit. However, Peter Maurer, the president of Diamond, testified at trial that Horowitch still had the option to sign the new D-Jet contract or have his $20,000 deposit returned to him.

**Conclusion**

Based on the foregoing, it is **ORDERED** and **ADJUDGED** that:

1.     The Clerk of the Court shall enter judgment in favor of Defendant Diamond and against Plaintiff Alan Horowitch on Plaintiff's ACFA claims;

2.     Defendant's Motion for Judgment on Partial Findings (Doc. No. 184) is **GRANTED in part** and **DENIED in part**.  Plaintiff's request for punitive damages is **DENIED**. The Motion is **DENIED as moot** in all other respects.

3.     Plaintiff's Motion for Reconsideration of the Order Denying Punitive Damages (Doc. No. 188) is **DENIED**.

4.     All claims for costs or attorneys' fees shall be asserted by counsel in a separate motion pursuant to Local Rule 4.18.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on December 22, 2009.

PATRICIA C. FAWSETT, JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record